UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RICHARD J. ABRAMO, ROBERT V.
BROWN, and JOHN A. TOMASSETTI,

                         Plaintiffs,

          v.                                          1:09-CV-269 (LEK/DRH)


TEAL, BECKER & CHIARAMONTE,
CPA's, P.C., and JAMES W. DRISLANE,
CPA,

                         Defendants.

_____


**MEMORANDUM-DECISION AND ORDER**


I.       **INTRODUCTION**

         Presently before the Court is Defendants' Motion to dismiss (Dkt. No. 5) Plaintiffs'

Complaint (Dkt. No. 1) in its entirety.  Plaintiffs Richard Abramo, Robert Brown and John

Tomassetti assert claims of professional malpractice (Claim One), fraudulent misrepresentation

(Claim Two), aiding and abetting fraud (Claim Three), aiding and abetting a breach of fiduciary

duty (Claim Four), and conspiracy in violation of the Racketeering Influence and Corrupt

Organizations Act under section 1962(d) of that Act (Claim Five).  Defendants are the accounting

firm Teal, Becker & Chiaramonte, CPA's, P.C. ("TBC") and James W. Drislane, CPA ("Drislane").

On March 6, 2009, Defendants removed this case from Albany County Supreme Court to the

Northern District of New York, whereupon this Court assumed jurisdiction pursuant to 28 U.S.C.

§1441(a) and 28 U.S.C. 1332(a) based on an amount in controversy in excess of $75,000 and

complete diversity between Plaintiffs, citizens of New Jersey, and Defendants, citizens of New

York.  For the reasons that follow, Defendants' Motion to dismiss is granted in part and denied in

part.


**II.     BACKGROUND**

Plaintiffs in this action are three former co-owners of Tougher Industries, Inc. ("Tougher"), a

closely-held New York corporation which operated as a general contractor for construction work

during the period relevant for this litigation.  Compl. at 3.  Along with non-party Steven Shaw

("Shaw"), the Plaintiffs obtained all capital stock in Tougher on or around September 22, 2003.  Id.

Plaintiffs' ownership interest in the company continued until December 31, 2005, at which time

they sold all of their shares to Shaw.  In the intervening period, Plaintiffs held positions on the

Tougher board of directors, and Shaw served as the company's president.  Id.  Of particular

importance to this action, Shaw employed Defendant TBC to provide various accounting-related

services for Tougher beginning, according to Plaintiffs, in September 2003.  Defendants explain that

TBC was engaged after the acquisition of the company by Plainitiffs and Shaw, and that TBC was

employed only by Tougher.  Mot. at 2.  The Complaint's causes of action stem from the manner in

which Plaintiffs allege that TBC and Drislane performed certain services in the course of their work

for Tougher and Shaw.

Plaintiffs allege that TBC was hired as Tougher's independent certified accountants and

auditors, with Drislane principally in charge of this work.  Compl. at 4.  From the fiscal year ending

on December 31, 2003 through part of 2005 and fiscal quarters during that period, Plaintiffs assert that Defendants undertook to prepare and certify the financial statements of Tougher, and that TBC generally undertook to examine and advise Tougher's accounting and bookkeeping.  Id.  Plaintiffs contend that Defendants also performed tax filing work for the Plaintiffs' personal tax returns in 2003 and 2004; the Defendants, however, expressly deny that this latter work occurred and submit that Jump, Scutellaro and Company, L.L.P, said to be Plaintiffs' personal accountants in New Jersey, performed the tasks.  Mot. at 2.  Plaintiffs allege that Shaw functioned as the primary contact between Tougher and TBC, and that the documents and information used by Defendants was provided by Shaw and employees under his control.  Compl. at 5.

Plaintiffs allege that, in addition to general accounting services, TBC provided business advice which included aiding Tougher's efforts to secure bonding for public sector contracts.  On February 26, 2004, Defendants issued a report of Tougher's consolidated financial statements for the year ending December 31, 2003.  Subsequently, on April 7, 2004, Plaintiffs entered into an indemnity agreement with Zurich American Company and Fidelity & Deposit Company of Maryland ("the Surety"), contractually establishing the contingency of  personal liability by Plaintiffs for Tougher debts; Plaintiffs allege they entered this agreement in reasonable reliance upon the report TCB issued in February.  Compl. at 6.  Plaintiffs assert they continued to operate Tougher based upon that report, believing the company to be financially viable and the potentiality of exposure to personal liability under the indemnity agreement would not come to pass.  Id. at 7.

Thereafter, Defendants conducted an audit of Tougher as of December 31, 2004; related to this audit, Defendants are alleged to have provided Plaintiffs with a preliminary consolidated balance sheet and statement of income and earnings for that period on or about April 7, 2005 which

3

stated net income to be $143,694 and a high level of accounts receivable.  Id. at 8.  Next,

Defendants are alleged to have produced a preliminary 2004 report listing a net loss of $95,538 and

a similarly high level of accounts receivable, which Tougher and Plaintiffs received on April 20,

2005.  Id.  Plaintiffs allege that they proceeded, individually and through their accountants, Jump,

Scutellaro and Company, L.L.P. ("Jump L.L.P."), to ask Defendants whether the reports accurately

stated allowances for accounts receivable for previous years, to which the Defendants are alleged to

have responded with assurances of accuracy.  Id. at 9.  Acting in reasonable reliance on the reports

and Defendants' assurances, Plaintiffs allege that they allowed the Surety to issue bonds in

connection with new construction jobs taken on by Tougher in May and June of 2005.  Id. at 10.

On July 25, 2005, Defendants are alleged to have issued the final report of their audit of

Tougher as of December 21, 2004, reporting substantially similar high levels of accounts receivable

of approximately $13,000,000 and net income of $142,462.  Id.  Then on or around September 27,

2005, Defendants are alleged to have reported on Tougher's balance sheet as of June 30, 2005 and

stated accounts receivable as now being approximately $8.9 million and net income as $148,337.

Plaintiffs allege that they continued to reasonably rely on this September 2005 report.  Id. at 11.

Jump L.L.P. is alleged to have reviewed Tougher's finances soon thereafter in October 2005 and

determined that Tougher's accounts receivable were "grossly overstated, in that nearly $2.9 million

of accounts receivable was over 120 days old, $1.6 million was invoiced in 2004 or earlier, and

nearly $500,000 had been invoiced in 2003 or earlier."  Id.  Further, Jump L.L.P.  is alleged to have

found that, due to a lack of certain documentation, recognized revenue figures reported by

Defendants were overstated by at least $1.4 million.  Id.

Several month later, on December 31, 2005, Plaintiffs sold their entire interest in Tougher to

4

Shaw, but "it was too late [for Plaintiffs] to limit their exposure on the Surety bonds" under the indemnification agreement, and "subsequent to the Plaintiffs' sale of their interest . . . Tougher began to default on its bonded contracts and obligations, both in respect to performance and payment, resulting in claims being filed against the bonds issued by the Surety." Id. at 13. Eventually, after Plaintiffs ceased to have any interest in the company, Tougher entered Chapter 11 bankruptcy on November 3, 2006, and, as a result, Plaintiffs allege that there are no assets to satisfy obligations under the Surety bonds, leaving Plaintiff personally liable to the Surety in excess of $1.8 million in addition to attorney fees, costs and other damages which Plaintiffs claim amount to approximately $3 million. Id. at 13-14.

Plaintiffs commenced this action against Defendants in Albany County Supreme Court on or about March 20, 2008, and it came before this Court on March 6, 2009. Previously, Plaintiffs brought an action against Shaw in this Court on November 28, 2006, for breaching the terms of their stock purchase agreement, which included an assumption by Shaw of indemnification obligations with respect to the Surety; Plaintiffs' unopposed motion for summary judgment was granted, thereby awarding them, *inter alia*, compensatory damages and specific performance by Shaw of his obligations under the purchase agreement. See generally Abramo et al v. Shaw, Case No. 1:06-cv-1433, Dkt No. 14. In the present action, however, Defendants have moved to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' claims are legally deficient. The Court turns now to that Motion.

### III.    STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6), a district court must accept

the allegations made by the non-moving party in its pleading as true and "draw all inferences in the light most favorable" to the non-moving party. In re NYSE Specialists Securities Litig., 503 F.3d 89, 95 (2d Cir. 2007).  A party seeking dismissal of a pleading under Rule 12(b)(6) bears a heavy burden, as the question presented by such a motion is not whether the claimant is ultimately likely to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" Log On America, Inc. v. Promethean Asset Mgmt. L.L.C., 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d. Cir. 1995) (internal quotation and citations omitted)).  "In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.'" Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "While Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [the non-moving party's] claims across the line from conceivable to plausible.'" In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 570). When considering a motion to dismiss a pleading for failure to state a claim, a court "may consider all papers and exhibits appended to the [pleading], as well as any matters of which judicial notice may be taken." Hirsch v. Arthur Andersen and Co., 72 F.3d 1085, 1092 (2d Cir. 1995); see Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (citation omitted). "'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss[.]" Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co., 62

6

F.3d 69, 72 (2d Cir. 1995) (quoting <u>Cortec Industries</u>, 949 F.2d at 47); <u>see</u> <u>Chambers v. Time</u>

<u>Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (emphasizing that "a plaintiff's *reliance* on the terms

and effect of a[n external] document in drafting the complaint is a necessary prerequisite to the

court's consideration of the document on a dismissal motion; mere notice or possession is not

enough.").  If a court considers materials other than those listed above, "the motion must be treated

as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d); <u>see</u> <u>Global Network</u>

<u>Communications, Inc. v. City of New York</u>, 458 F.3d 150, 154-56 (2d Cir. 2006).


**IV.    DISCUSSION**

A.  Professional Malpractice - Claim One

       *i.  Pre-March 21, 2005 Negligence*

      Plaintiff's First Cause of Action asserts that Defendants committed professional malpractice

in their provision of accounting services for Tougher and Plaintiffs.  This claim rests on allegations

that Defendants owed Plaintiffs a duty to exercise the care generally exercised in the accounting

profession, and that Defendants breached this duty, that Plaintiffs reasonably relied on Defendants'

allegedly negligent work, and that this reliance caused Plaintiffs to suffer damages.  The first

instance of professional negligence alleged by Plaintiffs is the independent auditor's report

submitted on February 26, 2004 which reviewed Tougher's finances for the fiscal year ending on

December 31, 2003.  Compl. at 14.  The last instance of professional negligence specifically alleged

by Plaintiffs is the report Defendants issued on September 27, 2005 providing an updated review of

Tougher's balance sheets.  Plaintiffs' allegations of causation and injury are expressed in their

statement that "[b]y reason of the malpractice, negligence, carelessness, and recklessness of the

7

Defendants, the Plaintiffs have suffered damages by reason of their exposure on the Surety bonds and other damages and losses believed to be in excess of $3,000,000." Id. at 17.

Given the dates of the events on which Plaintiffs' claim is predicated, Defendants have moved to dismiss the professional negligence claim as time-barred based upon application of controlling state law.  Defendants' argument is comprised of two parts: first, the contention that the pertinent statute of limitations in conjunction with the time at which Plaintiffs' action accrued bar Plaintiffs' malpractice claim for services received prior to three years before the filing date of the action; and further, the contention that Plaintiffs' entire malpractice claim, despite allegations of negligent acts not directly prohibited by the statute of limitations, is nonetheless time-barred because the damages pleaded by Plaintiffs are alleged to have arisen solely from the services received prior to three years before the filing date of the action.

To rule on these issues, the Court must initially determine the applicable law.  As a federal court sitting in New York, and exercising diversity jurisdiction, New York state choice-of-law rules and statutes of limitations govern this case.  Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  While "New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York . . . [t]his general rule, however, is subject to a traditional statutory exception, New York's 'borrowing' statute, C.P.L.R. § 202."  Stuart, 158 F.3d at 626 (citation omitted).  Section 202 provides that:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. C.P.L.R. 202.  In other words, "a case filed by a non-resident plaintiff requires application of the shorter statute of limitations period, as well as all applicable tolling provisions, provided by either New York or the state where the cause of action accrued." Cantor Fitzgerald v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002).  Ultimately, the effect of the borrowing statute is that "an action by a nonresident on a foreign cause of action is untimely if it is barred under the law of either New York or the state where the injury occurred." Stuart, 158 F.3d at 627.

In the present case, section 202 directs this Court to determine whether Plaintiffs' professional negligence claim is barred by either the New York or New Jersey statute of limitations for this type of action; New Jersey is the site where the cause of action is alleged to have accrued. See Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999) ("[A] cause of action accrues at the time and in the place of the injury . . . [and w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.") (citations omitted).  New York's statute of limitations for professional malpractice is set forth in N.Y. C.P.L.R. 214(6).  Among the "[a]ctions to be commenced within three years," § 214 lists "an action to recover damages for malpractice, other than medical, dental or podiatric malpractice, regardless of whether the underlying theory is based in contract or tort."  This three-year period is shorter than the six years provided for under New Jersey law.  See N.J. Stat. Ann. §2A:14-1. Therefore, because New York law prescribes the shorter limitations period, its three-year term applies in this case.

Of related consideration is the law defining accrual dates for Plaintiffs' action.  Under New York law, "[i]n the context of a malpractice action against an accountant, the claim accrues upon the client's receipt of the accountant's work product since this is the point that a client reasonably relies

on the accountant's skill and advice and, as a consequence of such reliance, can become liable for tax deficiencies." Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 541 (1991). Plaintiffs, however, make the argument that even assuming the New York statute of limitations, and all applicable tolling provisions, govern their claim, New Jersey's "discovery rule" for the accrual of professional negligence actions should nonetheless apply in this case. The adoption of this portion of New Jersey law, which Plaintiffs argue defines accrual as the time that they discovered the alleged malpractice, would effectively toll the New York statute of limitations from the time at which Plaintiffs received Defendants' work and thus push forward New York's statue of limitations. Not only would such a result directly conflict with the policy of N.Y. C.P.L.R. 202, but there is simply no sound reason or applicable precedent given for why this isolated element of New Jersey law should be taken to operate in the present case. Accordingly, the Court finds that New York law allows the Plaintiffs three years from the time that they received negligent work from Defendants to bring a malpractice claim based on that work. Plaintiffs filed against Defendants on March 21, 2008. Thus, their professional negligence claim cannot arise from Defendants' work received prior to March 21, 2005. Any claim based on alleged negligence which occurred before that date is time-barred under N.Y. C.P.L.R. 214(6).

Plaintiffs contend that New York's "continuous representation" doctrine, which carves out a limited exception to the three-year bar in qualifying circumstances, should prevent the statute of limitations from barring any portion of their claim.[1] Generally speaking, the doctrine "recognizes

---

[1] The "continuous representation" doctrine originated with respect to medical malpractice claims and is codified as such at N.Y. C.P.L.R. 214-a, termed "continuous treatment." However, "[t]he rule of continuous treatment, or more appropriately continuous representation, applies to other types of professionals, such as lawyers. Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1 (2007).

that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or manner in which the services are rendered." Shumsky v. Eisenstein, 96 N.Y.2d 164, 167 (2001). The doctrine has a narrow scope, however, which is commensurate with the precise policy interests it serves. "Application of the continuous representation or treatment doctrine is nonetheless generally limited to the course of representation concerning a specific legal matter or of treatment of a specific ailment or complaint; 'the concern, of course, is whether there has been continuous treatment, and not merely a continuing relation between physician and patient.' Id. (quoting McDermott v. Torre, 56 N.Y.2d 399, 405 (1982)). Thus, the "continuous representation doctrine tolls the statute of limitations . . . where there is a mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim." McCoy v. Feinman, 99 N.Y.2d 295, 306 (2002).

In the recent case of Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1 (2007) , the Court of Appeals considered application of the continuous representation doctrine in the context of an accounting malpractice claim. The defendant had employed an improper valuation technique in performing annual audits of an investment fund, resulting in material overstatements of the holdings of the funds for a number of years. The trustee of that fund brought suit more than three years after the last improper audit had occurred and argued that the continuous representation doctrine should permit the action to proceed. After discussing the policy rationale of the doctrine, the Court of Appeals concluded that "[t]aken together, plaintiff's allegations establish defendant's failures within a continuing professional relationship, not a course of representation as to the particular problems

---

11

(conditions) that gave rise to plaintiff's malpractice claims," and therefore the doctrine had no application.  Id.  Per the plaintiff's allegations, the investment fund "entered into annual engagements with defendant for the provision of separate and discrete audit services for the Funds' year-end financial statements, and once defendant performed the services for a particular year, no further work as to that year was undertaken;" there was no allegation that the fund and defendant "explicitly contemplated further representation regarding the audits."  Id.  Without this "mutual understanding"and because the fund lacked "awareness of a condition or problem warranting further representation," the court found that "the purpose underlying the continuous representation doctrine" was not served.  Id.

        The Williamson analysis, given the substantially similar facts to the case at issue, is highly instructive for this Court.  While Plaintiffs allege facts which show an ongoing business relationship in the provision of periodic auditing services, they do not allege that there was a continuing course of representation with respect to a particular service being rendered by Defendants.  This distinction is key, and the absence of such an actual allegation places the business relationship between Plaintiffs and Defendants outside the scope of the "continuous representation" exception to the statute of limitations.  Plaintiffs allege only discrete services performed by Defendants, and do not indicate the existence of a mutual understanding between the parties that a certain service, such as a past audit, was specifically subject to ongoing representation, such as "corrective or remedial services (e.g., to reexamine a prior year's financial statements or redo a prior year's audit)."  Id.  That Defendants' various services contributed to Tougher obtaining bonding is consistent with the parties' continuous business relationship, but it does not suffice as the kind of particular, ongoing problem necessary to qualify under the continuous representation doctrine.  Without Plaintiffs'

"awareness of a condition or problem warranting further representation[, and since]. . . no course of representation was alleged," Plaintiffs were not obligated to interrupt "a course of representation as to the particular problems" underlying their malpractice claim in order to cease their business relationship with Defendants and bring suit against them.  Id.  Accordingly, the continuous representation doctrine does not apply in this case.  No exception alters the Court's finding that Plaintiffs' professional negligence claim cannot arise from Defendants' work received prior to March 21, 2005.

<i>ii.  Post-March 21, 2005 Negligence</i>

Defendants' Motion contends that not only is the portion of Plaintiffs' malpractice claim which alleges negligence occurring before March 21, 2005 time-barred, but that Plaintiffs' entire malpractice claim, as pleaded, is also barred because Plaintiffs' alleged damages arise solely from negligence during that period; this is so, Defendants contend, because all of Plaintiffs' alleged damages stem from their April 7, 2004 entry into the indemnification agreement.  Mot. at 9.  Under this view, even though Plaintiffs allege that the financial reports issued by Defendants on April 20, 2005, July 25, 2005 and September 27, 2005 were instances of malpractice, the malpractice claim should be dismissed because there are no alleged damages which derive from the Defendants' work post-dating the March 21, 2005 bar.  Review of Plaintiffs' Complaint persuades the Court that, while Defendants' argument may or may not ultimately have merit, there are issues of material fact which prevent the Court from dismissing Plaintiffs' malpractice claim in its entirety.

The Complaint asserts that Plaintiffs received negligent work on the aforementioned dates for which their action remains viable under the statute of limitations.  The Complaint's allegation of damages arising from the malpractice claim is not differentiated with respect to what instances of

13

negligence caused what injury to Plaintiffs.  See Compl. at 14-17.  Indeed, the manner in which

Plaintiffs plead causation -- the connection between the Defendants' alleged negligence and ultimate

liability and costs suffered by Plaintiffs -- is far from a model of adequate pleading, and Defendants

assert that it is legally deficient.  Except for broadly alleging that Plaintiffs relied on inaccurate

accounting reports when entering into and approving bonding under the indemnity agreement, the

Complaint does not explain how the inaccuracies and reliance actually caused or resulted in the

losses subsequently experienced.  For example, as Defendants contend, adverse business conditions,

mistakes and failures by Tougher may have directly led to the losses.  Mot. at 13.  Per the

Complaint, Plaintiffs allege only the initial step of reliance in assuming the risk of personal liability

and the ultimate assertion of $3,000,000 in damages when the Tougher collapsed.  Compl. at 16-17.

Nonetheless, in line with Plaintiffs pleadings, it is possible that Plaintiffs would not have entered

into the general indemnity agreement if Defendants' accounting work had been performed

otherwise, though this possibility encounters a limitations bar.  Further, however, having once

entered the indemnity agreement, Plaintiffs raise the possibility that they may have had

opportunities to have avoiding incurring potential liabilities under the agreement if they had known

about the poor financial and operational health of Tougher.  At present, these issues create questions

of fact, and they pose reasonable inferences that the Court shall make in considering Defendants'

Motion.

Because of the bar imposed by the three-year limitations period, it is evident that Plaintiffs

cannot sue for damages arising from the allegedly negligent work on which Plaintiffs claim to have

relied in entering the indemnity agreement, regardless of when those damages may have been

incurred; they can only sue for damages that arise from work claimed as malpractice which was

received after March 21, 2005.  Thus, the question is whether Plaintiffs' Complaint sufficiently alleges damages arising from malpractice occurring after that date or whether all of the damages alleged arise from negligent work received at a time for which action is barred.  Specifically, in reference to the Complaint, the question becomes whether Plaintiffs' allegations that they "allowed the Surety to issue bond[s]" on May 3, 2005 and June 9, 2005, and their general allegations of "damages by reason of their exposure on the Surety bonds and other damages and losses believed to be in excess of $3,000,000" indicates the existence of a malpractice claim for damages that are not barred by the statute of limitations.  See Compl. at 10, 17.

The Court does not agree with Defendants' contention that Plaintiffs' entire malpractice claim is necessarily barred by the statute of limitations.  The allegations that negligence by Defendants was a substantial cause of Plaintiffs' allowance of bonds to issue on May 3 and June 9 of 2005, which in turn led to damages, create issues of facts as to whether damages indeed arose from malpractice committed during the time period permitting suit.  Accordingly, the Court dismisses with prejudice only those claims based on pre-March 21, 2005 negligence and recognizes that a possible malpractice claim may be contained within or indicated by Plaintiffs' broad malpractice claim.

The fate of what remains of Plaintiffs' current claim in view of this Court's immediate rulings is thus unsettled. The fact that Plaintiffs' malpractice claim is not barred with respect to a certain subset of allegations does not mean that Plaintiffs' pleadings, in their current form, are sufficient to avoid dismissal.  Federal Rule of Civil Procedure 8(a) requires there to be "a short and plain statement of the claim showing that the pleader is entitled to relief," and Plaintiffs must allege facts that make out a facially plausible claim.  Patane, 508 F.3d at 111-12.  As a result of this

15

Court's decision on the application of the statute of limitations, these requirements are not met; because Plaintiffs asserted their malpractice claim without differentiating the action either with respect to the impact of the statute of limitations or with regard to what damages were substantially caused by what acts of negligence, the Court cannot identify an intact section of Plaintiffs' pleading operable as a sufficient claim.  For example, the Court cannot assume that the same damages pled for the entire malpractice claim may be fully transferred to the claim that may remain.  It is necessary, then, that the portion of Plaintiffs' malpractice claim which is predicated on negligence after March 21, 2005 be dismissed, but without prejudice.  Accordingly, consistent with the Court's analysis, Plaintiffs may re-file upon their choosing.

     *iii.  Privity*

  Defendants also challenge Plaintiffs' claim as lacking a requisite basis in privity between the parties.  Because TBC prepared their work product for Tougher and Plaintiffs were simply corporate shareholders, Defendants assert that there is not the contractual privity or near-privity required to assert a professional negligence claim.  It is conceded that there is no direct contractual relationship between the parties, and so the issue raised is whether the parties had a relationship or connections that permit the Plaintiffs to bring a malpractice claim. Under New York law:

> Before accountants may be held liable in negligence to non-contractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551 (1985).  "The indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a

relationship or bond with the once-removed accountants sufficiently approaching privity based on some conduct on the part of the accountants." Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co., 79 N.Y.2d 695, 702-3 (1992) (quotations and citations omitted).  For example, in the companion to Credit Alliance Corp., European Am. Bank & Trust Co. v. Straughs & Kaye, 65 N.Y.2d 536, 545 (1985), the court found that "[b]ecause [plaintiff's] complaint and affidavit posit a direct nexus between the parties, to wit: the direct communications between them concerning [plaintiff's] intended reliance" the causes of action were adequately alleged.

   Plaintiffs' Complaint sufficiently alleges facts supporting the criteria of near privity.  It is asserted that Defendants knew that their financial reports would be used in connection with obtaining surety bonds; and knew that Plaintiffs would rely on the reports to this end; and that Defendants sent reports to the Plaintiffs as three of the four owners of the company, members of the Board of Directors and the principals responsible for securing bonding through the signing of personal guarantees.  See generally, Compl. at 4-14.  The Court observes that Plaintiffs' pleadings indicate a very real "nexus" between the parties.  Taking the factual contents of the Complaint as true, the Defendants work was done, in significant part, to obtain the bonding that necessarily involved Plaintiffs signing the indemnity agreement.  Thus, by that Complaint, Defendants were employed by Tougher, where Plaintiffs comprise three fourths of Tougher, to generate information for Tougher and Plaintiffs in order for the latter to undertake obligations to benefit the former.  The limited number of interwoven actors in these circumstances and the sufficiency of Plaintiffs' allegations as to the Credit Alliance Corp. criteria persuade this Court that near privity is adequately alleged for purposes of maintaining this action.

17

B.  Duplicative Claims - Claims Two, Three and Four

In addition to the claim of professional malpractice, Plaintiffs' Complaint asserts four other

causes of action: fraudulent misrepresentation, aiding and abetting fraud, aiding and abetting a

breach of fiduciary duty, and a conspiracy violation of the Racketeering Influence and Corrupt

Organizations Act under section 1962(d) of that Act ("RICO claim").  Setting aside the RICO claim

for the moment, the Court's review of the factual allegations underlying these claims and the

Plaintiffs' recitation of damages identical to those alleged in the malpractice claim ascertains that

dismissal of these latter claims is warranted for presenting duplications of Plaintiffs' malpractice

action.  "Where, as here, a fraud claim is asserted in connection with charges of professional

malpractice, it is sustainable only to the extent that it is premised upon one or more affirmative,

intentional misrepresentations . . . which have caused additional damages, separate and distinct from

those generated by the alleged malpractice." Tasseff v. Nussbaumer & Clarke, Inc., 298 A.D.2d

877, 878 (4th Dept. 2002) (quoting White of Lake George, Inc. v. Bell, 251 A.D.2d 777, 778 (3rd

Dept. 1998).  White of Lake George states that, along with the necessary pleading of additional

damages, a fraud claim that arises out of the broad set of facts on which a malpractice claim is based

must also allege "something more egregious than mere 'concealment or failure to disclose [one's]

own malpractice.'" White of Lake George, Inc., 251 A.D.2d at 778 (quoting LaBrake v. Enzien, 167

A.D.2d 709 (3rd Dept. 1990) (explaining that "where the measure of damages in each case is the

same . . . a separate cause of action for fraud may be established where exposure to liability is not

based on errors of professional judgment, but is predicated on proof of the commission of an

intentional tort.")).  The Complaint before the Court alleges a single claim of professional

negligence on the part of Defendants, while the other claims, on their face, are restated and re-

labeled iterations of that cause of action.

First, each of these latter claims repeats the same damages element with no substantive variation from the malpractice pleading. Thus, the negligence claim asserts: "By reason of the malpractice, negligence, carelessness and recklessness of the Defendants, the Plaintiffs have suffered damages by reason of their exposure on the Surety bonds and other damages and losses believed to be in excess of $3,000,000." The fraudulent misrepresentation claim states: "As the direct and proximate result of Plaintiffs' detrimental reliance upon the Defendants' fraudulent or reckless misrepresentations, the Plaintiffs have suffered damages in excess of $3,000,000." Next, the aiding and abetting fraud claim recites: "As the direct and proximate result of the Defendants['] actions, the Plaintiffs have suffered damages in excess of $3,000,000." The aiding and abetting breach of fiduciary duties claim, in parallel fashion, alleges: "As a direct and proximate result of Defendant' aiding and abetting of Shaw's breach of fiduciary duty to the Plaintiffs, the Plaintiffs have suffered damages in excess of $3,000,000." Finally, the RICO claim asserts: "As the direct, proximate, and foreseeable result of the aforesaid activities by Shaw and the Defendants, the Plaintiffs have suffered damages in excess of $3,000,000." See generally Compl. It is no coincidence that these claimed damages are identical; the factual allegations made to support them are precisely the same, as well. Indeed, the only difference between the claims, each of which incorporates the Complaint's main body of allegations and the contents of any preceding claims, is an overlay of conclusory assertions matching the elements required for each claim.

The fraud claim, for example, simply adds the allegation that Defendants acted with fraudulent intent, specifically with respect to representations concerning the quality and standards of their work and their own independence, such that the alleged negligent work product of Defendants

is purported to take on the form of fraud.  Conspicuously absent are any factual allegations of "affirmative, intentional misrepresentations . . . which have caused additional damages, separate and distinct from those generated by the alleged malpractice."  Tasseff, 298 A.D.2d at 878.  The aiding and abetting claims are even more bare of substance that would render them separate from Plaintiffs' malpractice claim.  Each contains no independent factual allegations and rests entirely on the Defendants' alleged professional negligence, while adding the skeletal language that Defendants were "explicitly or implicitly, agreeing or conspiring" to further Shaw's fraud and that they assisted his fiduciary breach by "knowingly and deliberately providing audits, reports, opinions, and reviews that were not independent and that did not accurately reflect Tougher's financial condition in accordance with accepted accounting principles and standards."  Compl. at 19, 21.  It is apparent that these claims do no more than attach a series of terms to the core cause of action and factual allegations of accounting malpractice.  See American Tissue, Inc. v. Andersen, 275 F. Supp. 2d 398, 405 n.7 (S.D.N.Y. 2003) ("Although [Plaintiff] brings claims for malpractice, breach of contract, and breach of fiduciary duty, these three causes of action boil down to one claim for the provision of deficient accounting services."  N.Y. C.P.L.R. 214(6) specifies that a malpractice claim, "regardless of whether the underlying theory is based in contract or tort," must be brought within three years of its accrual; this Court may not permit Plaintiffs to avoid that statutory bar by styling their professional negligence claim as any number of others causes of action without alleging sufficient facts and damages to render those claims independent.  Accordingly, Claims Two, Three and Four on dismissed on this basis.


C. RICO Claim - Claim Five

Plaintiffs' RICO claim fails for independent reasons.  As provided by 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Further, under subsection (d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."  18 U.S.C. § 1962(d). It is under this latter provision that Plaintiffs allege Defendants conspired with Shaw to violate § 1962(c) "to prepare false, misleading, and/or fraudulent financial audits, reports, and K-1 Statements for Tougher . . . by reflecting a more favorable financial outcome and condition of the Company than actually existed . . . ."  RICO Case Statement at 1.  Critically, however, in the absence of a valid substantive cause of action, § 1962(c) in the instant matter, there can be no cognizable conspiracy claim under § 1962(d).  Thus, at this stage, Plaintiffs must allege that the Defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise."  Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229 (2d Cir. 1999). Because a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," the allegations against Defendants, if proven, must show that the predicate acts to which they are alleged to have agreed would constitute a pattern of racketeering activity had they been carried out.  Salina v. United States, 522 U.S. 52 (1998).  "Thus, under any prong of §1962, a plaintiff in a civil RICO suit must establish a pattern of racketeering activity."  Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (quotations and citations omitted).

The defect in Plaintiffs' RICO claim is simple and unequivocal.  There are no factual

allegations that, if proven, would show Defendants conspired to engage in a pattern of racketeering; rather, the allegations describe activity that definitively does not rise to the level of such a pattern. In order to allege a sufficient pattern, RICO imposes a "continuity" requirement that can be met "either by showing a 'closed-ended' pattern -- a series of related predicate acts extending over a substantial period of time -- or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." Id. (citations omitted).  Here, Plaintiffs attempt to plead a closed-ended pattern, see RICO Case Statement at 7, but their allegations fall short.

"A closed-ended pattern of racketeering activity involves predicate acts 'extending over a substantial period of time.'"  First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004) (quoting GICC Capital Corp. v. Technology Fin. Group, 67 F.3d 463, 466 (2d Cir. 1995)).  The Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years . . . [and] while two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern."  First Capital Asset Mgmt., 385 F.3d at 181 (emphasis in original).  As to this further content, "[a]lthough continuity is 'primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.'"  Id. (quoting De Falco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001)).

In response to the prompt to "[p]rovide the dates of the predicate acts, the participants in the predicate acts and a description of the facts surrounding the predicate acts," see RICO Case

Statement at 3, Plaintiffs allege the first predicate act occurred on February 26, 2004, when Defendants transmitted a false and fraudulent financial report.  The final predicate act is alleged to have occurred on September 27, 2005, when Defendants transmitted a false and fraudulent financial report.  These specified allegations create a span of time approximately five months shy of two years.  Plaintiffs also reference the period of "September 2003," the date around which Defendants are said to have been hired;[2] it is stated that Shaw and the Defendants communicated at this time, but there is no allegation of predicate acts until the first purportedly false financial report was transferred.  "The duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit," De Falco, 244 F.3d at 321, and so the date of hiring is irrelevant for purposes of establishing a sufficient pattern.  Nonetheless, in their Response to Defendants' Motion, Plaintiffs assert that "the predicate acts occurred over a period of more than two years - from September 2003 (when Defendants were retained by Tougher to perform accounting services) through December 31, 2005 (when Plaintiffs sold their interest in Tougher)."  Response at 34.  As is the case with the hiring period, the date on which Plaintiffs ceased to own any interest in Tougher is not predicate act and was not alleged as one in the RICO Case Statement.  Accordingly, the Court must reject Plaintiffs' efforts to cast their factual allegations as crossing the two-year minimum threshold for a RICO pattern. Even assuming that the Court were to consider September 2003 until December 2005 as the duration marked by predicate acts, the very limited "number and variety of predicate acts, [] number of both participants and victims, and [] presence of separate schemes" indicate the lack of a sufficient pattern for Plaintiffs' RICO claim to be maintained.  First Capital Asset Mgmt., 385 F.3d at 181.  As there is no pattern of racketeering activity underlying Claim Five,

_____

[2]Defendants allege TBC was hired in October of 2003.

it necessarily fails and, therefore, is dismissed.

**IV.      CONCLUSION**

Accordingly, it is hereby

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 5) is GRANTED in part and

DENIED in part, consistent with the foregoing discussion; and it is further

**ORDERED**, that Plaintiffs' Claim One is DISMISSED with prejudice as to that portion

predicated on alleged negligence barred by the applicable statute of limitations and without

prejudice as to that portion of the claim which is not time-barred; and it is further

**ORDERED**, that Claims Two, Three, Four and Five are DISMISSED; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**


DATED:         May 12, 2010
               Albany, New York

Lawrence E. Kahn
U.S. District Judge